**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 19-cv-02209-NRN

TEDDY PITTMAN,

      Plaintiff,

v.

CITY OF AURORA,
OFFICER DELBERT TISDALE, JR.,
OFFICER DAVID ZIMMERMAN,
OFFICER JEREMY MCELROY, and
OFFICER ANTHONY SPANO,

      Defendants.

---

**FIRST AMENDED COMPLAINT AND JURY DEMAND**

---

      Plaintiff Teddy Pittman ("Mr. Pittman"), by and through his undersigned counsel, hereby submits the following First Amended Complaint and Jury Demand ("Complaint"):

## I.  INTRODUCTION

      1.    This case concerns the intentional and cavalier harassment of a nearly 40-year-old African American man by City of Aurora police officers, who repeatedly stopped Mr. Pittman for fictitious traffic infractions and unlawfully subjected him to unnecessarily long detentions and invasive searches of his body and vehicle without a legal basis in January and April 2019 solely due to his arrest record and race.

      2.    The unlawful searches and seizures of Mr. Pittman in January and April 2019 are part of (and caused by) a widespread pattern, practice, and custom among Aurora police officers of unlawfully extending traffic stops beyond their permissible scope and duration to conduct

unlawful and invasive searches of the bodies and vehicles of African Americans based on their race and arrest record, and not on consent, reasonable suspicion, probable cause, or any other lawful basis.

3. This practice is not only expressly prohibited by clearly established United States Supreme Court and Tenth Circuit case law, but has been condemned by Aurora's own City Attorney's Office, criticized in multiple citizen complaints filed with the Aurora Police Department's Internal Affairs Bureau, and highlighted in several civil rights lawsuits filed against the City of Aurora in federal court. It has nevertheless continued unabated without any of the officers involved being punished, re-trained, or subjected to additional supervision, and with Deputy Chief of the Aurora Police Department even condoning such practices under oath in a deposition taken just a few months ago.

4. Incredibly, an Aurora Police Department official acknowledged in a recent 30(b)(6) deposition on behalf of the City that the Department provides its officers *no* supervisory review, policies, or training regarding the legal standard for performing pat-down searches of individuals' bodies. Instead, he said the Department simply trusts its officers "to go out there and do the right thing every day."

5. Mr. Pittman now seeks to (i) demonstrate the extent of this blatantly unconstitutional custom, pattern, and practice, and the Aurora Police Department's failure to appropriately train or supervise its officers to prevent such misconduct from occurring; (ii) obtain declaratory and compensatory relief; and (iii) impose punitive damages to deter this type of misconduct in the future.

## II.  JURISDICTION & VENUE

6.      This action is authorized and instituted pursuant to 42 U.S.C. § 1983. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331.

7.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), as the events giving rise to the claims asserted in this Complaint occurred within the State of Colorado.

## III. PARTIES

8.      At all times relevant to the subject matter of this litigation, Mr. Pittman was a U.S. citizen and domiciled in the State of Colorado. He is a 40-year old African American man.

9.      At all times relevant to the subject matter of this litigation, Defendant Delbert Tisdale, Jr. was employed by the City of Aurora, Colorado as a police officer, acting under the color of state law as a police officer. He is herein identified in his individual capacity.

10.     At all times relevant to the subject matter of this litigation, Defendant David Zimmerman was employed by the City of Aurora, Colorado as a police officer, acting under the color of state law as a police officer. He is herein identified in his individual capacity.

11.     At all times relevant to the subject matter of this litigation, Defendant Jeremy McElroy was employed by the City of Aurora, Colorado as a police officer, acting under the color of state law as a police officer. He is herein identified in his individual capacity.

12.     At all times relevant to the subject matter of this litigation, Defendant Anthony Spano was employed by the City of Aurora, Colorado as a police officer, acting under the color of state law as a police officer. He is herein identified in his individual capacity.

13.     Defendant City of Aurora, Colorado is a municipality established under the law of Colorado, and is responsible for the policies, procedures, training, custom, and conduct of its officers who operate as employees of the Aurora Police Department.

## IV. FACTUAL ALLEGATIONS

### A.     The April 3, 2019 Unlawful Search and Seizure of Mt. Pittman

14.     On April 3, 2019, Mr. Pittman was driving his vehicle from a 7-11 convenience store to the King's Motor Inn when he noticed he was being followed by an Aurora Police Department patrol car.

15.     Officer Delbert Tisdale was driving the patrol car, with Officer David Zimmerman sitting in the front passenger seat.

16.     Approximately four minutes before effectuating the traffic stop, Officers Tisdale and Zimmerman searched the NCIC/CCIC database and confirmed and that Mr. Pittman's car registration was valid, and that he had no outstanding warrants.

17.     Because they ran Mr. Pittman's car registration, they knew he was African American before they pulled him over.

18.     As Mr. Pittman pulled into the parking lot of the King's Motor Inn, Officers Tisdale and Zimmerman activated their emergency lights to effectuate a traffic stop, and Mr. Pittman immediately stopped his vehicle.

19.     Mr. Pittman was driving in full compliance with all traffic laws and the officers observed no unlawful behavior either before or after they started following Mr. Pittman.

20.     Mr. Pittman was very scared, because he had done nothing wrong and did not know why he was being stopped.

4

21.     Officer Tisdale approached the driver's side of the vehicle and ordered Mr. Pittman to roll down all of his windows.

22.     He then used his flashlight to look in the back of Mr. Pittman's vehicle but found no passengers, weapons, or evidence of any criminal activity.

23.     While Officer Tisdale approached the driver's side of Mr. Pittman's vehicle, Officer Zimmerman approached the passenger's side, used his flashlight to look in the back of Mr. Pittman's vehicle, and ordered Mr. Pittman to roll down his passenger's side window.

24.     Officer Zimmerman also saw no passengers, weapons, or evidence of any criminal activity in Mr. Pittman's vehicle.

25.     Officer Zimmerman then kept his flashlight trained on Mr. Pittman's left side while Officer Tisdale asked him questions.

26.     Officer Tisdale claimed he stopped Mr. Pittman because he purportedly failed to use his turn signal, but Mr. Pittman knew the reason for the stop was faulty because he had properly used his turn signal.

27.     Thus, the officers' fictitious reason for the traffic stop was pretextual, and the true reason for the stop was that Mr. Pittman is an African American driver in a predominantly white city.

28.     Within seconds, Officers Jeremy McElroy and Anthony Spano arrived on the scene in a second patrol car.

29.     Mr. Pittman was not provided an explanation for why additional officers had arrived on the scene, nor was any reason apparent.

30.     Upon information and belief, Officers Tisdale and Zimmerman signaled or called for a second patrol car to respond to the scene because of Mr. Pittman's race.

31.     Officers Spano and McElroy then exited their patrol car and approached the rear of Mr. Pittman's vehicle, so that it was surrounded by visibly armed police officers.

32.     Officer Tisdale obtained Mr. Pittman's insurance and registration and gave it to Officer Zimmerman, who returned to their patrol car to run a background check on Mr. Pittman.

33.     Officer Spano then approached the passenger's side of Mr. Pittman's vehicle and shined his flashlight on Mr. Pittman through his passenger-side window.

34.     After several minutes, Officers Zimmerman, Spano, Tisdale, and McElroy determined that they were not going to issue Mr. Pittman a citation for his purported failure to use his turn signal.

35.     Therefore, the purpose of the traffic stop was complete, and they should have immediately returned Mr. Pittman's documents and allowed him to leave.

36.     Instead of returning his documents, however, Officers Zimmerman, Tisdale, McElroy, and Spano continued to detain Mr. Pittman, unlawfully extended the scope and duration of the stop an additional ten minutes, and transformed the stop into a criminal investigation.

37.     Officer Zimmerman asked Mr. Pittman if he was a gang member and ordered Mr. Pittman step out of his vehicle so he could search Mr. Pittman's person and vehicle for drugs and weapons.

38.     The traffic stop was transformed into a criminal investigation and Mr. Pittman was ordered to subject to an invasive body search without reasonable suspicion that he was armed and

dangerous or probable cause that he had committed a crime, but solely based on Mr. Pittman's race and arrest record.

39.     Officers Zimmerman, Spano, and McElroy stood just a few feet away from Officer Tisdale and Mr. Pittman, so they could clearly see that Mr. Pittman is African American, and they could see and hear Officer Zimmerman's interactions with Mr. Pittman.

40.     Thus, Officers Zimmerman, Spano, and McElroy knew that Officer Tisdale intended to search Mr. Pittman's body and his vehicle solely because of his race and arrest record, and not based on reasonable suspicion, probable cause, or any other lawful grounds.

41.     After Mr. Pittman declined consent to the unlawful search of his person and vehicle, Officer Tisdale removed him from his vehicle, and Officers Zimmerman, McElroy, and Spano unlawfully searched Mr. Pittman's person for several minutes.

42.     Officers Tisdale, Zimmerman, McElroy, and Spano, did not find anything illegal on Mr. Pittman's person.

43.     Once the search of Mr. Pittman's person was complete, Officers Zimmerman, Tisdale, McElroy, and Spano forced Mr. Pittman to sit on the bumper of Officer Zimmerman and Officer Tisdale's patrol car surrounded by visibly armed police officers.

44.     The officers' lapel cameras clearly show that Mr. Pittman felt threatened, and was exhausted, scared, and humiliated throughout the process of the unlawful search and detention.

45.     Officers Spano and McElroy then performed an in-depth and unlawful search of Mr. Pittman's vehicle—including opening and rummaging around inside the center console, examining the papers in the cupholders of his center console, removing a portion of the center console to search underneath it, and searching all of Mr. Pittman's doors.

46.     Officers Spano and McElroy lacked consent, reasonable suspicion, or any other lawful basis to search Mr. Pittman's vehicle.

47.     Officers Tisdale and Zimmerman could clearly see the unlawful search of Mr. Pittman's vehicle by Officers Spano and McElroy, as they were standing only a few feet away, yet neither officer said or did anything to stop the unlawful conduct.

48.     The officers never offered any justification for their unlawful search and seizure of Mr. Pittman or his vehicle.

49.     The officers did not have reasonable suspicion, probable cause, or any other legal bases, to believe that Mr. Pittman had committed any weapons related crimes prior to or during the traffic stop, or that he was armed and dangerous.

50.     Officers McElroy and Spano did not find anything illegal in Mr. Pittman's vehicle.

51.     Mr. Pittman was never charged with any crimes or issued any traffic citations as a result of the April 3, 2019 incident.

52.     Additionally, several minutes of lapel camera footage from the April 3, 2019 search and seizure was lost or destroyed by the City of Aurora.

53.     Mr. Pittman filed a complaint with the Aurora Police Department's Internal Affairs Bureau regarding the incident on April 3, 2019.

54.     The complaint was reviewed by Lieutenant Cerinich in Internal Affairs (the same officer who reviewed Mr. Pittman's complaint regarding the January 19, 2019 unlawful search and seizure), and he determined that the officers' actions on April 3, 2019, were lawful, appropriate, and did not violate Aurora Police Department policy.

55.     Specifically, Lieutenant Cerinich wrote that the "pat down search for weapons" on April 3, 2019 was reasonable solely because of Mr. Pittman's arrest record and alleged gang affiliation.

56.     Lieutenant Cerinich therefore determined that no disciplinary action, training, or additional supervision was necessary.

57.     Upon information and belief, no officer has been disciplined, reprimanded, or received additional training as a result of the April 3, 2019 incident.

**B.     The City of Aurora Has a Continuing, Persistent, and Widespread Informal Custom of Unlawfully Stopping and Searching African Americans**

58.     City of Aurora police officers have engaged in a pervasive pattern and practice of unlawfully extending traffic stops beyond their permissible scope and duration to conduct unlawful and invasive searches of the bodies and vehicles of African Americans based solely on their race and arrest record, and not on consent, reasonable suspicion, probable cause, or any other lawful basis.

59.     The City of Aurora has a lengthy and well-documented history of misconduct involving African Americans that is strikingly similar to what occurred with Mr. Pittman on April 3, 2019—including a prior unlawful search and seizure of Mr. Pittman in January 2019, an unlawful search and seizure of Nakiko Diallo in November 2016, an unlawful search and seizure of Angela Brown in April 2017, several unlawful searches and seizures of Keith Penny including (but not limited to) one in April 2017, an unlawful search and seizure of James Lawrence in January 2018, and several unlawful searches and seizures of Jehrone Falls in September and November 2019.

60.     In every instance set forth below, officers unlawfully extended the duration of a traffic stop and unlawfully searched African Americans' bodies and vehicles based on their race and arrest record, and not on any lawful basis. In every instance, no officer was disciplined, retrained, or subjected to additional supervision for their misconduct. In nearly every instance, a lawsuit was filed in federal court and the City of Aurora was put on notice of its officers' misconduct. And, following Mr. Pittman's unlawful search and seizure in January 2019, Aurora's own City Attorney's Office condemned the practice as unlawful. Despite these repeated warning signs and pervasive instances of misconduct, the Aurora Police Department has persistently and deliberately refused to take any corrective action to prevent such misconduct from occurring.

*1.  Nakiko Diallo – November 9, 2016 Unlawful Search and Seizure*

61.     On November 19, 2016, Aurora police officers effectuated a traffic stop of Nakiko Diallo (an African American man) and subjected him to invasive searches of his body and vehicle based on his race and arrest record, and without probable cause, reasonable suspicion, or any other lawful basis.

62.     Mr. Diallo was pulled over in a traffic stop, allegedly for driving above the speed limit and having non-functioning taillights.

63.     Because Officer Matthew Milligan obtained Mr. Diallo's license, registration, and other documents from him, he knew that Mr. Diallo was African American.

64.     Officer Milligan ordered Mr. Diallo to exit his vehicle, searched Mr. Diallo's body, and then instructed him to sit on the curb.

65.     Officer Milligan then returned to his patrol car, ran a background check, learned of Mr. Diallo's arrest record, and then told another officer: "We need to search this vehicle essentially."

66.     Officer Milligan sought Mr. Diallo's consent to conduct a search of his vehicle, but Mr. Diallo declined. Officer Milligan proceeded with the search anyway.

67.     The decision to search Mr. Diallo's vehicle was without reasonable suspicion, probable cause, or any other lawful basis, and was instead based solely on his race and arrest record.

68.     In a subsequent inventory search of Mr. Diallo's vehicle recorded by Officer Milligan's body camera, Officer Milligan can be seen searching a lunch box and finding no drugs or other contraband, then turning off his camera.

69.     When Officer Milligan instructed another officer to search the same lunch box again several minutes later, drugs and other contraband were suddenly easily visible.

70.     Mr. Diallo filed a civil rights lawsuit in federal court against the City of Aurora in December 2018 regarding this incident, which is case number 18-cv-2898.

71.     Upon information and belief, no officer has been disciplined, retrained, or subjected to additional supervision as a result of the November 9, 2016 incident with Mr. Diallo.

   2.  *Angela Brown & Keith Penny – April 15, 2017 Unlawful Search and Seizure*

72.     On April 15, 2017, Aurora police officer Andrew McDermott effectuated a traffic stop on a young African American couple—Angela Brown and Keith Penny—and subjected them to invasive searches of their bodies and vehicle based solely on their race and Mr. Penny's arrest record, and without probable cause, reasonable suspicion, or any other lawful basis.

73.     That day, Ms. Brown was driving down East Colfax Avenue with her husband in the passenger seat when Officer McDermott and his partner, Officer Hess, pulled them over.

74.     As Aurora officers had done with Mr. Pittman in January 2019, Officer McDermott explained that he had pulled Ms. Brown over because of a defective taillight, and requested she produce her driver's license, registration, and insurance.

75.     Officer McDermott then returned to his patrol car and ran background checks on Ms. Brown and Mr. Penny.

76.     Shortly thereafter, Officer McDermott exited his patrol vehicle and told Officer Hess that "[Mr. Penny's] got priors for coke, drug abuser, and gang stuff. . . . So let's pull em' out [of the car], we'll pat em' down, [and] just sit em' [on the curb]. I'll ask her for consent, if she denies it either way we'll protective sweep the car, make sure there's no weapons in there and then I'll finish the summons."

77.     Officer McDermott was aware that both Ms. Brown and Mr. Penny are African American.

78.     Without consent or any other lawful basis, Officer McDermott ordered Mr. Penny to exit the vehicle and informed him that he was going to pat him down.

79.     Officer McDermott searched Mr. Penny's body, including an in-depth examination of his arms, legs, and waistband, and Mr. Penny was ordered to sit on the curb.

80.     Officer McDermott then instructed Ms. Brown to exit the vehicle so he could conduct a search of her person, walked her to the back of her vehicle, and performed an unusually invasive search of her body—placing his hands over sensitive locations like her groin area.

81.     Officer McDermott then instructed Ms. Brown to sit on the curb next to her husband.

82.     Officer McDermott then searched Ms. Brown's vehicle, including the side doors, seats, and middle console.

83.     While searching the back of Ms. Brown's vehicle, Officer McDermott can be heard saying: "There's dope in here somewhere."

84.     Officer McDermott explained to Mr. Penny and Ms. Brown that he decided to search the vehicle because of Mr. Penny's "prior arrests for drug distribution," and later said that "in years of doing this job, I have found that typically speaking, people who have a past that's similar to yours tend to reoffend more often than not."

85.     Officer McDermott then explained that the "benefit" of conducting such searches outweighed any interests possessed by Ms. Brown or Mr. Penny.

86.     Nothing illegal was found on Mr. Penny's or Ms. Brown's bodies, nor was anything illegal found in Ms. Brown's vehicle.

87.     Officer McDermott searched Ms. Brown's and Mr. Penny's bodies and Ms. Brown's vehicle solely because of their race and Mr. Penny's arrest record, and without any lawful basis to do so.

88.     This was not the first time, however, that Mr. Penny was unlawfully searched by Aurora officers.

89.     Upon information and belief, Mr. Penny had been stopped by Aurora officers on at least four or five occasions before April 15, 2017 and was pulled out of the vehicle and subjected to body searches on most of those occasions.

90.     A complaint was filed with the Aurora Police Department's Internal Affairs Bureau regarding the April 15, 2017 incident.

91.     During the Internal Affairs investigation, Officer Hess stated that, "[i]f we're going to pull somebody out of a car during the course of a traffic stop, it's kind of standard that we do a quick pat-down [search]"— apparently without needing reasonable suspicion, probable cause, or any other lawful basis to do so.

92.     The Internal Affairs Bureau ultimately determined that the officers' conduct during the April 15, 2017 search was lawful, and that no discipline, training, or additional supervision was necessary.

93.     Mr. Penny and Ms. Brown filed a civil rights lawsuit in federal court against Officer McDermott and the City of Aurora, alleging that Officer McDermott unlawfully seized them, unlawfully searched their bodies, and unlawfully searched Ms. Brown's vehicle, which is case number 19-cv-01108.

94.     Upon information and belief, no officer has been punished, been disciplined, or received additional training or supervision as a result of the April 15, 2017 searches and seizures of Ms. Brown and Mr. Penny, nor has any officer been punished for the prior unlawful seizures and searches of Mr. Penny.

3. *Ten Unlawful Searches Identified by Dan Montgomery*

95.     In their lawsuit, Mr. Penny and Ms. Brown also disclosed an expert witness in police procedure, Dan Montgomery, who reviewed fourteen separate police reports regarding searches conducted by Officer McDermott in 2016 and 2017.

96.     Mr. Montgomery determined that Officer McDermott "did not collect objective, articulable facts necessary for, and did not have sufficient reasonable suspicion to conduct body pat down searches for weapons" in *ten of the fourteen* cases he reviewed.

97.     Mr. Montgomery also noted that "[e]ach of these police reports had to be reviewed by a supervisor and based on what I have reviewed, they were all approved, thus condoning Officer McDermott's actions and enabling him to continue his performance improprieties."

98.     Upon information and belief, a disproportionate number of the individuals in the ten unlawful body searches identified by Mr. Montgomery were people of color.

99.     Upon information and belief, no officer has been disciplined, retrained, or subjected to additional supervision as a result of the ten unlawful searches identified by Mr. Montgomery.

*4.   James Lawrence – January 31, 2018 Unlawful Search and Seizure*

100.    On January 31, 2018, James Lawrence was subjected to an unlawful search and seizure by City of Aurora officers based on his race and arrest record, and without probable cause, reasonable suspicion, or any other lawful basis.

101.    Like Mr. Penny, Mr. Diallo, Mr. Falls, and Mr. Pittman, Mr. Lawrence is an African American man.

102.    After Officer Grant Peet pulled Mr. Lawrence over for purported traffic infractions, he requested Mr. Lawrence's license, registration, and insurance.

103.    Officer Peet then returned to his patrol car to run a background check on Mr. Lawrence.

104.    Having received the results of Mr. Lawrence's background check, Officer Peet approached Mr. Lawrence's vehicle and stated to his partner that he was "gonna pull him out [of his vehicle]."

105.    Without explanation or warning, Officer Peet then grabbed Mr. Lawrence's left arm and wrist through the driver's window and twisted it into a wrist lock, ordered him to put his right hand on his head, and opened his car door.

106.    While keeping Mr. Lawrence's arm in a twist-lock, Officer Peet forced Mr. Lawrence to his feet and searched his person without consent, reasonable suspicion, probable cause, or any other lawful basis.

107.    Officer Peet then told Mr. Lawrence that "[t]he reason we're doing that is because of your history—you got weapons charges, things like that in the past."

108.    Officer Peet asked for consent to search Mr. Lawrence's vehicle, and he declined.

109.    Officer Peet then proceeded to perform a search of Mr. Lawrence's vehicle without consent, reasonable suspicion, probable cause, or any other lawful basis.

110.    Upon information and belief, no officer has been disciplined, retrained, or subjected to additional supervision as a result of the unlawful searches and seizures of Mr. Lawrence.

    5.    *Teddy Pittman – January 19, 2019 Unlawful Search and Seizure*

111.    On January 19, 2019, Mr. Pittman was driving his vehicle westbound on East Colfax Avenue in Aurora, Colorado, when he noticed he was being followed by a City of Aurora Police Department patrol vehicle.

112.    The patrol vehicle was driven by Officer Darian Dasko with Officer Daniel Veith riding in the front passenger seat.

113.     Officers Dasko and Veith were driving eastbound on East Colfax Avenue when they passed and observed Mr. Pittman's person and vehicle as he was heading westbound, so they saw Mr. Pittman's race and were aware that he is African American.

114.     Officer Dasko turned around at North Havana Street and East Colfax Avenue to pursue Mr. Pittman's vehicle.

115.     Officers Dasko and Veith followed Mr. Pittman for approximately 18 blocks until he entered the City of Denver, at which point they activated their emergency lights to effectuate a traffic stop of Mr. Pittman.

116.     Mr. Pittman was driving in full compliance with all traffic laws and the officers observed no unlawful behavior either before or after they started following Mr. Pittman.

117.     Mr. Pittman immediately pulled over and stopped his vehicle.

118.     Mr. Pittman was scared and confused, because he had done nothing wrong and did not know why he was being stopped.

119.     Officer Dasko approached the driver's side of the vehicle and used his flashlight to look in the back of Mr. Pittman's vehicle but found no passengers, weapons, or evidence of a crime.

120.     Officer Dasko explained to Mr. Pittman that he was stopped for a defective driver's side headlamp, then asked for Mr. Pittman's driver's license, vehicle registration, and proof of insurance.

121.     Mr. Pittman knew that the reason for the stop was faulty because his headlamps were functioning properly.

122. Thus, the officers' fictitious reason for the traffic stop was pretextual, and the true reason for the stop was that Mr. Pittman is an African American driver in a predominantly white city.

123. Shortly after Officers Dasko and Veith effectuated the traffic stop of Mr. Pittman, Defendants Ryan Burke and Kevin Palacio arrived on the scene in a second patrol car.

124. Mr. Pittman was not provided an explanation for why additional officers had arrived on the scene, nor was any reason apparent.

125. Upon information and belief, Officers Dasko and Veith signaled or called for a second patrol car to respond to the scene because of Mr. Pittman's race.

126. Even though Mr. Pittman knew that the reason for the stop was faulty, he handed his documents to Officer Dasko, who returned to his patrol vehicle to perform a background check on Mr. Pittman.

127. Officers Dasko and Veith then ran Mr. Pittman through the NCIC/CCIC database and learned that Mr. Pittman did not have any outstanding warrants and that his car registration was valid.

128. Officers Dasko and Veith subsequently ran Mr. Pittman's name through the PIMS (Aurora Police Records System) database and learned of a purported gang affiliation and prior arrest from 2016.

129. After nearly ten minutes during which Mr. Pittman sat in his vehicle with his hands on the wheel, Officers Dasko and Veith determined that Mr. Pittman was "code four."

130.    A "code four" means that he did not have any outstanding warrants, his car registration was valid, and he was not going to receive a citation for the allegedly defective headlight.

131.    Therefore, the purpose of the traffic stop was complete, and they should have immediately returned Mr. Pittman's documents and allowed him to leave.

132.    Instead of returning his documents and allowing him to leave, however, Officers Dasko and Veith impermissibly continued to detain Mr. Pittman, unlawfully extended the scope and duration of the stop, and transformed the stop into a criminal investigation.

133.    Even though the purpose of the traffic stop was complete, Officer Dasko returned to Mr. Pittman's vehicle and demanded several times that Mr. Pittman step out of his vehicle, so that the officers could search his person for weapons.

134.    While Officer Dasko was asking Mr. Pittman to step out of the car to perform a search of his body, Officer Burke approached the passenger side of Mr. Pittman's vehicle, Officer Veith approached the driver's side of the vehicle, and Officer Palacio was behind the vehicle, which meant that Mr. Pittman's vehicle was surrounded by several visibly armed police officers.

135.    Mr. Pittman denied consent and stated several times that he would not exit his vehicle because the officers had no right to search his person or his vehicle.

136.    Mr. Pittman asked Officer Dasko if he (Mr. Pittman) was "code four," and Officer Dasko confirmed that he was.

137.    Mr. Pittman then stated that if he was "code four," he should be allowed to leave.

138.    Officer Dasko again ordered Mr. Pittman to step out of his vehicle and told him "the reason why I'm asking you to step out is that I know you're an associated gang member."

139.    Officer Dasko never offered any other justification to Mr. Pittman for extending the duration of the stop, transforming the traffic stop into a criminal investigation, or for ordering him to subject himself to an invasive search of his person.

140.    The traffic stop was transformed into a criminal investigation and Mr. Pittman was ordered to subject to an invasive search of his person without reasonable suspicion that he was armed and dangerous or probable cause that he had committed a crime, and based solely on Mr. Pittman's race and arrest record.

141.    Officers Veith, Burke, and Palacio stood just a few feet away from Officer Dasko, so they could clearly see and hear his interactions with Mr. Pittman.

142.    Officers Veith, Burke, and Palacio could see that Mr. Pittman was African American and could clearly hear Officer Dasko state that Mr. Pittman was "code four," so they knew that the purpose of the traffic stop was complete at that time and Mr. Pittman should have been allowed to leave.

143.    Officers Veith, Burke, and Palacio also heard Officer Dasko order Mr. Pittman to step out of his vehicle for a search because he was "an associated gang member" after telling him he was "code four."

144.    Thus, Officers Veith, Burke, and Palacio knew that Officer Dasko was unlawfully extending the traffic stop, turning it into a criminal investigation, and searching Mr. Pittman's person solely because of his race and arrest record, and not based on reasonable suspicion, probable cause, or any other lawful grounds.

145.     Officers Burke, Veith, and Palacio had the opportunity to speak with Officer Dasko, explain that such a search and detention was unlawful, physically intervene to stop his actions, or tell Mr. Pittman that he was free to leave.

146.     Not only did Officers Burke, Veith, and Palacio fail to intervene, they affirmatively supported, encouraged, and participated in the unlawful search and seizure of Mr. Pittman.

147.     When Mr. Pittman declined consent to the unlawful search of his person, Officer Veith was standing immediately behind Officer Dasko and falsely stated to Mr. Pittman: "You're being given a lawful order."

148.     After Mr. Pittman repeated his refusal to consent, Officers Veith and Dasko grabbed his left arm and wrist through the driver's window and twisted it into a wrist lock, opened Mr. Pittman's car door, and ordered him to put his right hand on his head.

149.     While keeping Mr. Pittman's left arm in a twist-lock, Officer Dasko and Veith forced Mr. Pittman to his feet and to the back of his vehicle.

150.     Officer Dasko then unlawfully searched Mr. Pittman's body for several minutes, including an in-depth examination of his arms, legs, and waistband, while Officers Veith, Palacio, and Burke observed the unlawful search without saying or doing anything.

151.     No drugs or evidence of a crime were found on Mr. Pittman's person.

152.     Once the search of Mr. Pittman's person was complete, Officers Dasko, Veith, Palacio, and Burke forced Mr. Pittman to sit on the sidewalk with his ankles crossed.

153.     While Mr. Pittman was sitting on the curb, Officer Dasko stood over him and repeated, "The reason you were removed from the vehicle is I know you're a known gang member and you had some weapons offenses."

154.    Officers Veith, Palacio, and Burke could see and hear the interactions between Officer Dasko and Mr. Pittman, as they were standing only a few feet away, yet no officer said or did anything to stop the unlawful conduct.

155.    Officer Dasko asked Mr. Pittman for consent to search his vehicle, and Mr. Pittman declined by stating it was an unlawful search.

156.    Officer Dasko disregarded the lack of consent and performed an unlawful invasive search of Mr. Pittman's vehicle for several minutes—opening all of the doors, searching the doors, and searching the driver and passenger seats—while Officers Veith, Palacio, and Burke observed the unlawful misconduct without saying or doing anything.

157.    No drugs or evidence of a crime were found in Mr. Pittman's vehicle.

158.    After the unlawful vehicle search was finished, Mr. Pittman was forced to sit on the curb for nearly an additional twenty minutes with his ankles crossed and his head down.

159.    While he sat on the curb, Mr. Pittman was surrounded by Officers Veith and Burke—who were visibly armed and standing over Mr. Pittman.

160.    Upon information and belief, Officer Palacio was only a few feet away, observing the continued detention of Mr. Pittman.

161.    By continuing to detain Mr. Pittman and failing to intervene in Officer Dasko's unlawful search and seizure of his person and vehicle, Officers Veith, Burke, and Palacio actively participated in the unlawful search and seizure.

162.    The officers' lapel cameras clearly show that Mr. Pittman felt threatened, and was exhausted, scared, and humiliated throughout the process of the unlawful search and detention.

163.    To cover up the unlawful search and misconduct, Officer Dasko gave Mr. Pittman a contrived charge for "failing to obey a lawful order." What actually occurred, however, is that Mr. Pittman lawfully refused to exit his vehicle and lawfully refused to subject himself to an unlawful search of his person and vehicle.

164.    The unlawful search and detention of Mr. Pittman lasted nearly 40 minutes in total (including 30 minutes after the purpose of the traffic stop was complete) before Mr. Pittman was finally allowed to get back into his vehicle and leave.

165.    Aurora Assistant City Attorneys Andrea Wood and George Koumantakis both reviewed Mr. Pittman's criminal case for "failing to obey a lawful order" during the January 19, 2019 traffic stop, and dismissed the charges because they both determined the Defendant Officers lacked any legal basis to remove Mr. Pittman from his vehicle for an invasive search of his person, and the order in question was thus unlawful.

166.    Mr. Pittman filed a complaint with the Aurora Police Department regarding the January 19, 2019 incident.

167.    The complaint, incident report, and body camera footage from the January 19, 2019 incident was reviewed by Lieutenant Chad Cerinich in the Bureau of Internal Affairs for the Aurora Police Department.

168.    Although Lieutenant Cerinich could clearly see and hear on the body camera footage that Mr. Pittman was unlawfully seized and searched based on his race and arrest record, Lieutenant Cerinich nevertheless determined that the actions of Officers Dasko, Burke, Veith, and Palacio involving Mr. Pittman on January 19, 2019 were lawful and that no disciplinary action, training, or additional supervision was necessary.

169.    Not satisfied with simply allowing the actions of Officers Dasko, Veith, Burke, and Palacio to go unpunished, Lieutenant Cerinich also wrote Deputy City Attorney Julie Heckman (Chief of the Criminal Division) to advise her that he disagreed with the decision by Assistant City Attorneys Wood and Koumantakis to dismiss the criminal charges against Mr. Pittman, and that their interpretation of constitutional law governing Mr. Pittman's unlawful search and seizure was incorrect.

170.    Upon information and belief, Lieutenant Cerinich has not received any discipline, retraining, or supervision, as a result of his approval of the actions of Officers Dasko, Burke, Veith, and Palacio, despite being notified by the Aurora City Attorney's Office that such conduct was unlawful.

171.    Mr. Pittman filed a separate civil rights lawsuit in federal court against the City of Aurora as a result of the officers' unlawful searches and seizures of him and his vehicle on January 19, 2019, which is case number 19-cv-01947.

172.    Upon information and belief, no officer has been disciplined, reprimanded, or received additional training as a result of the January 19, 2019 incident with Mr. Pittman.

    6.  *Jehrone Falls – September 2, 2019, September 17, 2019, & November 29, 2019 Unlawful Searches and Seizures*

173.    On three separate occasions in September and November 2019, Aurora police officers unlawfully searched and seized Jehrone Falls' body and vehicle based solely on his race and arrest record, and without consent, reasonable suspicion, probable cause, or any other lawful basis.

174.    Mr. Falls is an African American man.

175.    On September 2, 2019, Mr. Falls was pulled over by City of Aurora police officers for allegedly failing to obey a signal light.

176.    Officer Dustin Peterson obtained Mr. Falls' license, insurance, and registration, and returned to his patrol car to perform a background check.

177.    Officer Peterson returned and demanded Mr. Falls step out of his vehicle.

178.    When Mr. Falls declined, Officer Peterson opened his door, put his arm in a twist lock, and pulled him out of the vehicle. Officers Peterson, Ploch, and other unidentified officers searched Mr. Falls' body and vehicle without consent, probable cause, reasonable suspicion, or any other lawful basis.

179.    Like Mr. Pittman, Officer Peterson told Mr. Falls that he was entitled to search his person and vehicle for drugs and guns because of his arrest record.

180.    Just fifteen days later, on September 17, 2019, Mr. Falls was subjected to another traffic stop by City of Aurora officers, purportedly for having improperly attached license plate validation tabs.

181.    Officer Jeremy McElroy (who was involved in the April 3, 2019 unlawful search and seizure of Mr. Pittman) obtained Mr. Falls' license, insurance, and registration, and returned to his patrol car to perform a background check on him.

182.    A few minutes later, Officers McElroy and Ellis returned to Mr. Falls' vehicle, opened his driver's-side door, put his arm in a twist lock, and pulled him out of the vehicle without warning.

183.    Officers McElroy and Ellis searched Mr. Falls' person and vehicle without consent, probable cause, reasonable suspicion, or any other lawful basis.

184.    Officer McElroy said that he had to search Mr. Falls' person and vehicle for drugs and guns because of his arrest record.

185.    Nothing illegal was found during the two September searches, and Mr. Falls was allowed to leave with a traffic citation after being detained for nearly an hour.

186.    Two months later, on November 29, 2019, Mr. Falls was again stopped by Aurora police officers, allegedly for having his headlights off when he pulled out of a parking lot.

187.    Officer Rosenblatt obtained Mr. Falls' documents and returned to his patrol car to run a background check on Mr. Falls.

188.    Officer Rosenblatt returned and ordered Mr. Falls out of his vehicle, but Mr. Falls declined, so Officer Rosenblatt forcefully removed him from the vehicle.

189.    Officers Rosenblatt and Spitzer then searched Mr. Falls' body and vehicle without consent, reasonable suspicion, probable cause, or any other lawful basis.

190.    Officer Rosenblatt told Mr. Falls that he had to search his vehicle and body for drugs and guns because of his arrest record.

191.    Again, nothing illegal was found in the search of Mr. Falls' body and vehicle.

192.    Mr. Falls filed complaints with the Aurora Police Department's Internal Affairs Bureau regarding the three unlawful searches and seizures.

193.    In response, the Bureau stated that the officers had done nothing wrong or ignored the complaints altogether.

194.    Mr. Falls filed a civil rights lawsuit in federal court against the City of Aurora regarding these three unlawful searches and seizures, which is case number 19-cv-3722.

195.    Upon information and belief, no officer has been reprimanded, disciplined, re-trained, or subjected to additional supervision as a result of the three unlawful searches and seizures of Mr. Falls from September to November 2019.

## V.  CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
*42 U.S.C. § 1983*
*Fourth Amendment – Unlawful Search of Person*
**(Plaintiff Teddy Pittman Against Officers Zimmerman, Tisdale, McElroy, and Spano)**

196.    Mr. Pittman hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

197.    The Fourth Amendment to the United States Constitution provides individuals with the right to be free from unreasonable searches of their person.

198.    The right not to be subjected to an invasive search of the body without sufficient evidence to establish reasonable suspicion of being armed and dangerous is clearly established. *See Terry v. Ohio*, 391 U.S. 1 (1968).

199.    Any reasonable person in the position of Officers Zimmerman, Tisdale, McElroy, and Spano knew or should have known of this clearly established right.

200.    Officer Tisdale violated Mr. Pittman's Fourth Amendment rights by removing him from his vehicle to search his person without having reasonable suspicion to believe he was armed or dangerous, or any other lawful basis.

201.    Officers Zimmerman, Tisdale, McElroy, and Spano violated Mr. Pittman's Fourth Amendment rights by searching his person for several minutes without consent, probable cause, reasonable suspicion, or any other lawful basis.

202.    The actions of Officers Zimmerman, Tisdale, McElroy, and Spano were made in intentional, malicious, willful, and/or reckless disregard of Mr. Pittman's constitutional rights.

203.    As a direct and proximate result of the actions of Officers Zimmerman, Tisdale, McElroy, and Spano in conducting the unlawful search of his body, Mr. Pittman suffered economic, emotional distress, humiliation, and dignitary injuries.

**SECOND CLAIM FOR RELIEF**
*42 U.S.C. § 1983*
*Fourth Amendment – Unlawful Search of Vehicle*
**(Plaintiff Teddy Pittman Against Officers Burke, Veith, Palacio, and Dasko)**

204.    Mr. Pittman hereby incorporates all of the paragraphs of this Complaint as if set forth fully herein.

205.    The Fourth Amendment to the United States Constitution provides individuals with the right to be free from unreasonable searches of their property.

206.    The right not to be subjected to a protective sweep of your vehicle without reasonable suspicion has been clearly established for forty years. *See Michigan v. Long*, 463 U.S. 1032, 1049 (1983).

207.    Any reasonable person in the position of Officers Zimmerman, Tisdale, McElroy, and Spano knew or should have known of this clearly established right.

208.    Officers McElroy and Spano violated Mr. Pittman's Fourth Amendment rights by searching his vehicle for several minutes without consent, probable cause, reasonable suspicion, or any other lawful basis, and based solely on his race and arrest record.

209.    The decision by Officers McElroy and Spano to search Mr. Pittman's vehicle was not objectively reasonable in light of the circumstances confronting them.

210.    Officers Tisdale and Zimmerman failed to intervene in the unlawful search of Mr. Pittman's vehicle by Officer Spano and McElroy, despite standing just a few feet away and observing them perform an invasive search Mr. Pittman's vehicle for several minutes.

211.    The actions of Officers Zimmerman, Tisdale, McElroy, and Spano were made in intentional, malicious, willful, and/or reckless disregard of Mr. Pittman's constitutional rights.

212.    As a direct and proximate result of the actions of Officers Spano and McElroy in conducting the unlawful search of his vehicle, and in Officers Tisdale and Zimmerman in failing to intervene in the unlawful search, Mr. Pittman suffered economic, emotional distress, humiliation, and dignitary injuries.

**THIRD CLAIM FOR RELIEF**
*42 U.S.C. § 1983*
*Fourth Amendment – Unlawful Seizure*
**(Plaintiff Teddy Pittman Against Officers Tisdale and Zimmerman)**

213.    Mr. Pittman hereby incorporates all of the paragraphs of this Complaint as if set forth fully herein, each and every allegation contained in the preceding Paragraphs of this Complaint.

214.    When Officers Zimmerman and Tisdale effectuated a traffic stop of Mr. Pittman in their patrol car, he was detained and not free to leave.

215.    Officers Zimmerman and Tisdale did not have reasonable suspicion, probable cause, or any other lawful basis to effectuate a traffic stop of Mr. Pittman because he had not committed a traffic infraction or any other crimes.

216.    Although Officers Officers Zimmerman and Tisdale claimed Mr. Pittman failed to use his turn signal, but Mr. Pittman appropriately used his turn signal when he turned into the parking lot of the King's Inn.

217.    Thus, the Officers' purported reason for pulling Mr. Pittman over was pretextual, and the stop was instead unlawfully based on Mr. Pittman's race.

218.    The actions described herein of Officers Zimmerman and Tisdale deprived Mr. Pittman of the rights, privileges, liberties, and immunities protected by the Constitution of the United States of America, including the right to freedom from unreasonable seizure as guaranteed by the Fourth Amendment.

219.    As a direct and proximate result of the actions of Officers Zimmerman and Tisdale in conducting and enforcing this unlawful seizure, Mr. Pittman suffered economic, emotional distress, humiliation, and dignitary injuries.

**FOURTH CLAIM FOR RELIEF**
*42 U.S.C. § 1983*
*Fourth Amendment – Wrongful Detention*
**(Plaintiff Teddy Pittman Against Officers Zimmerman, Tisdale, McElroy, and Spano)**

220.    Mr. Pittman hereby incorporates all of the paragraphs of this Complaint as if set forth fully herein.

221.    Once Officers Tisdale and Zimmerman had confirmed Mr. Pittman's license and registration were valid and determined that they were not going to write him a traffic summons, the purpose of the traffic stop was complete, and they should have returned his documents and allowed him to leave.

222.    Instead of returning Mr. Pittman's documents, however, Officers Zimmerman, Tisdale, McElroy, and Spano intentionally and unlawfully extended the duration of the stop and transformed it into a criminal investigation by surrounding Mr. Pittman's vehicle with several

visibly armed police officers and keeping their patrol cars parked behind Mr. Pittman's vehicle, so that he could not exit the parking lot.

223.    Officers Zimmerman, Tisdale, McElroy, and Spano unlawfully continued to detain Mr. Pittman for an additional 10 minutes after the purpose of the traffic stop was complete by forcing him to sit on the bumper of Officer Zimmerman and Officer Tisdale's patrol vehicle with his head down and surrounded by several visibly armed police officers without consent, probable cause, reasonable suspicion, or any other lawful basis.

224.    During this 10-minute period, Mr. Pittman was confined by Officers Zimmerman, Tisdale, McElroy, and Spano in a limited space, enforced by obstructive and forceful acts, and not permitted to leave.

225.    A reasonable person in Mr. Pittman's circumstances, when surrounded by several visibly armed police officers with his head down would not have felt free to leave.

226.    The actions described herein of Officers Zimmerman, Tisdale, McElroy, and Spano deprived Mr. Pittman of the rights, privileges, liberties, and immunities protected by the Constitution of the United States of America, including the right to freedom from unreasonable seizure as guaranteed by the Fourth Amendment.

227.    As a direct and proximate result of the actions of Officers Zimmerman, Tisdale, McElroy, and Spano and Palacio in conducting and enforcing this unlawful seizure, Mr. Pittman suffered economic, emotional distress, humiliation, and dignitary injuries.

## FIFTH CLAIM FOR RELIEF
### *42 U.S.C. § 1983*
### *Fourteenth Amendment – Equal Protection Clause*
### (Plaintiff Teddy Pittman Against Officers Zimmerman, Tisdale, McElroy, and Spano)

228.     Mr. Pittman hereby incorporates by reference, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

229.     Officers Zimmerman and Tisdale knew Mr. Pittman was African American before they effectuated a traffic stop of him because they performed a database search on his car and registration four minutes before stopping him, and certainly knew his race immediately after approaching his vehicle and ordering him to roll down his windows.

230.     Officer Spano knew Mr. Pittman was African American shortly after the traffic stop was effectuated, when he walked up to the passenger's side of Mr. Pittman's vehicle and shined his flashlight on Mr. Pittman through the passenger's window.

231.     Officer McElroy knew Mr. Pittman was African American no later than when Mr. Pittman was unlawfully removed from his vehicle because he was standing just a few feet away and could easily see Mr. Pittman's race.

232.     Although Officer Tisdale claimed Mr. Pittman failed to use his turn signal, he appropriately signaled his turn.

233.     Thus, the officers' fictitious reason for the traffic stop was pretextual, and the true reason for the stop was that Mr. Pittman is an African American driver in a predominantly white city.

234.     The decision by Officers Zimmerman, Tisdale, McElroy and Spano to extend the scope and duration of the traffic stop, transform it into a criminal investigation, and unlawfully remove Mr. Pittman from his vehicle to search him was motivated by Mr. Pittman's race.

235.    Officers Zimmerman, Tisdale, McElroy, and Spano would not have extended the scope and duration of the traffic stop, transformed it into a criminal investigation, or unlawfully removed Mr. Pittman from his vehicle to search his person if he were not African American.

236.    Officers Zimmerman and Tisdale would have intervened in Officer McElroy and Officer Spano's unlawful searches of Mr. Pittman's vehicle if Mr. Pittman were not African American.

237.    Officers Zimmerman, Tisdale, McElroy, and Spano would not have unlawfully seized and detained Mr. Pittman once the traffic stop was complete if he were not African American.

238.    The Defendant Officers' racial profiling of Mr. Pittman was consistent with the Aurora Police Department's racial profiling of Mr. Penny, Ms. Brown, Mr. Lawrence, Mr. Falls and Mr. Diallo.

239.    If Mr. Pittman, Mr. Penny, Ms. Brown, Mr. Lawrence, Mr. Falls, and Mr. Diallo were white, they would not have been pulled out of their vehicles and unlawfully seized and searched.

240.    In the alternative, African Americans are disproportionately impacted by the City of Aurora's policy of seizing and searching individuals based on their arrest records because African Americans are arrested in disproportionate numbers by City of Aurora police officers.

241.    As a direct and proximate result of the actions of Officers Zimmerman, Tisdale, McElroy, and Spano conducting and enforcing this unlawful search and seizure based on Mr. Pittman's race, Mr. Pittman suffered economic, emotional distress, humiliation, and dignitary injuries.

**SIXTH CLAIM FOR RELIEF**
*Monell Claim Pursuant to 42 U.S.C. § 1983 – Widespread Informal Custom or Practice of Violating the Fourth & Fourteenth Amendments*
**(Plaintiff Teddy Pittman Against the City of Aurora)**

242.    Mr. Pittman hereby incorporates by reference, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

243.    The multiple instances of misconduct identified above from just a three-year period collectively involved dozens of Aurora police officers—all of whom either actively participated in unconstitutional conduct, failed to intervene when they saw and heard it occurring, or failed to intervene when incident reports, citizen complaints, or civil rights lawsuits were filed in federal court.

244.    The actions of Officers Zimmerman, McElroy, Spano, and Tisdale on April 3, 2019 reveal an apparently sincerely held belief that African Americans be detained and searched at will based on their race and arrest record, despite lacking supporting evidence necessary for reasonable suspicion, probable cause, or any other lawful basis, and in deliberate disregard for their constitutional rights.

245.    Likewise, during his January 19, 2019 search and seizure of Mr. Pittman, Officer Dasko candidly and clearly communicated identical beliefs in front of Officers Veith, Palacio, and Burke, and none of them asked clarifying questions, corrected him, or stated that his understanding of the law was incorrect.

246.    In addition, Officer Dasko fabricated a charge to cover-up his and the other officers' misconduct in unlawfully ordering Mr. Pittman out of his vehicle for unlawful searches of his person and vehicle.

247.    Officers Dasko, Veith, Burke, or Palacio were never re-trained, reprimanded, provided additional training, or subjected to additional supervision by the City of Aurora for their misconduct on January 19, 2019.

248.    Nor were Officers Zimmerman, McElroy, Spano, and Tisdale ever re-trained, reprimanded, provided additional training, or subjected to additional supervision by the City of Aurora for their misconduct on April 3, 2019.

249.    The actions of the officers involved in the April 2019 unlawful search and seizure of Mr. Pittman are nearly identical to those of the officers involved in the January 2019 unlawful search and seizure of him. On both instances, officers engaged in pretextual traffic stops of Mr. Pittman, unlawfully extended the scope and duration of the stop, transformed the stops into criminal investigations, unlawfully removed Mr. Pittman from his vehicle to search his person, and then unlawfully searched his vehicle—all without probable cause, reasonable suspicion, or any other lawful basis.

250.    These actions indicate that, absent some intervention by a judge or jury, Mr. Pittman will likely continue to similar unlawful searches and seizures by Aurora police officers for the rest of his life.

251.    The actions and statements of the officers involved in the January and April 2019 unlawful searches and seizures of Mr. Pittman are strikingly similar to those of 20-year veteran Aurora Officer McDermott before he unlawfully extended the scope and duration of the traffic stop of Ms. Brown and Mr. Penny on April 15, 2017, transformed it into a criminal investigation, and unlawfully searched their bodies and Ms. Brown's vehicle. Officer McDermott said that "[Mr. Penny's] got priors for coke, drug abuser, and gang stuff. . . . So let's pull em' out [of the car],

we'll pat em' down, [and] just sit em' [on the curb]. I'll ask her for consent, if she denies it either way we'll protective sweep the car, make sure there's no weapons in there and then I'll finish the summons."

252.    Despite being informed of Officer McDermott's unlawful actions against Ms. Brown and Mr. Penny (and reviewing Officer McDermott's body cam footage in which he made the statements described above), the Deputy Chief of the Aurora Police Department testified on February 10, 2020 as a 30(b)(6) witness on behalf of the City of Aurora, that the City's position was that those actions were completely lawful and agreed that no discipline, training, or additional supervision was necessary for Officer McDermott as a result of that incident.

253.    Officer McDermott's and Officer Dasko's statements echo those of Officer Peet, when he told Mr. Lawrence on January 31, 2018 that "[t]he reason we're doing [a pat-down search] is because of your history—you got weapons charges, things like that in the past."

254.    They are, likewise, similar to the statements made by several Aurora officers during their unlawful searches and seizures of Mr. Falls on September 2, 2019, September 17, 2019, & November 29, 2019, that their actions were justified simply because of his arrest record.

255.    The confidence with which the officers involved in the unlawful searches and seizures of Ms. Brown, Mr. Penny, Mr. Pittman, Mr. Lawrence, and Mr. Falls (all of whom are African American) held and communicated their unconstitutional beliefs (and the failure of their fellow officers to intervene or correct their statements or actions), strongly suggests that they (and other Aurora officers) have been engaging in this type of unconstitutional conduct for many years, and that they are affirmatively trained to engage in this misconduct by the Aurora Police Department.

256.     The actions of Officer Zimmerman, Tisdale, McElroy, and Spano on April 3, 2019, were a direct result of (and caused by) this widespread custom and practice among Aurora police officers of stopping and searching African Americans based on their race and arrest record.

257.     The City of Aurora's cultivation of this policy has led to a belief among officers that stopping and searching African Americans based on their race and arrest record is reasonable.

258.     That none of the dozens of officers involved in these unlawful searches and seizures (or in reviewing them) said (or did) anything to stop them or prevent them from happening again demonstrates the City of Aurora's deliberate indifference to the constitutional rights of Mr. Pittman and every other African American unlawfully searched by Aurora police officers.

259.     Perhaps most incredibly, even after Aurora's own City Attorney's Office condemned this custom, pattern, and practice as unlawful, the Aurora Police Department not only failed to discipline, train, or require additional supervision for the officers involved, but even criticized the Head of the Criminal Division of the City Attorney's Office for Assistant City Attorneys intervening for saying such misconduct was unlawful.

260.     In other words, the Aurora Police Department intentionally disregarded the opinions of its own legal experts in the City Attorney's Office that its practices were unconstitutional.

261.     Lieutenant Cerinich's response to the Aurora City Attorney's Office's condemnation of this practice demonstrates that he has likely reviewed and approved dozens (if not hundreds) of similar Internal Affairs complaints regarding officers unlawfully extending traffic stops to perform body and vehicle searches based on the driver's race and arrest record, has taken

no corrective action to prevent this misconduct from continuing, and has instead repeatedly and expressly endorsed it.

262.    That Lieutenant Cerinich has not been disciplined, retrained, or subjected to additional supervision for his repeated intentional disregard for African Americans' constitutional rights demonstrates at a minimum an implicit approval of this misconduct from the highest levels of the Aurora Police Department.

263.    That the Aurora Police Department has continued to approve of its officers' actions and failed to intervene with discipline, training, or additional supervision even after two Assistant City Attorneys condemned the actions as unlawful, several citizens filed complaints with the Internal Affairs Bureau, and several citizens filed civil rights lawsuits in federal court against the City of Aurora, demonstrates the City's deliberate indifference to (and intentional violation of) the constitutional rights of Mr. Pittman and its other African American citizens.

264.    As a direct result of the City of Aurora's unconstitutional pattern and practice of stopping and searching African Americans' bodies and vehicles, Mr. Pittman lives in fear that he will be unjustifiably searched and seized at any time and was even forced to sell his vehicle at a substantial loss.

265.    As a direct and proximate result of City of Aurora's unlawful and pervasive pattern, custom, and practice of unlawfully searching and seizing African Americans based on their race and arrest record, Mr. Pittman suffered economic, emotional distress, humiliation, and dignitary injuries.

## SEVENTH CLAIM FOR RELIEF

### *Monell Claim Pursuant to 42 U.S.C. § 1983 - Deliberately Indifferent Training and Supervision Failures Resulting in Violations of the Fourth & Fourteenth Amendments* (Plaintiff Teddy Pittman Against the City of Aurora)

266.    The City of Aurora engaged in the following deliberately indifferent training and supervision practices that caused violations of Mr. Pittman's Fourth and Fourteenth Amendment rights:

a.   Failure to train police officers on the lawful basis for conducting a pat-down search of an individual's body;

b.   Failure to train police officers on the lawful basis for conducting a protective sweep of an individual's vehicle;

c.   Failure to train police officers not to seize or search individuals based on their race;

d.   Failure to train police officers not to seize or search individuals absent reasonable suspicion, probable cause, or any other lawful basis;

e.   Failure to train police officers not to seize or search individuals based solely on their arrest record;

f.   Failure to train police officers on the factual predicate for reasonable suspicion;

g.   Failure to institute appropriate supervision to prevent officers from unlawfully executing searches and seizures based on the individual's race and without reasonable suspicion or any other lawful basis;

h.   Failure to track and maintain demographic data regarding the individuals stopped and searched by City of Aurora officers to ensure that African Americans are not being racially profiled;

i.   Failure to discipline officers who execute searches and seizures based on the individual's race without reasonable suspicion or any other lawful basis; and

j.   Failure to impose additional supervision on officers who execute searches and seizures based on an individual's race and without reasonable suspicion or any other lawful basis.

267.     Through the complaints and lawsuits filed by Mr. Pittman, Ms. Brown, Mr. Penny, Mr. Falls, and others, the City of Aurora has been put on notice and/or known of its officers' beliefs and pattern of misconduct, other similar examples of officers stopping vehicles, conducting unsupported searches, and extending detentions beyond the limits of the law during traffic stops, yet has not intervened to stop the practice with appropriate training, retraining, discipline, or supervision.

268.     Quite the contrary, the only explanation for such widespread misconduct is that the City of Aurora affirmatively teaches its officers to engage in it, including but not limited to instruction through Officer McDermott and the review and approval of internal affairs complaints by Lieutenant Cerinich without taking any corrective action.

269.     In addition, the City of Aurora has acknowledged that, despite being on notice of this widespread pattern of misconduct, it does not train its officers on the proper standards for conducting a pat down search of a person or a protective sweep of a vehicle.

270.     On February 10, 2020, Commander Jad Lanigan testified as a 30(b)(6) witness on behalf of the City of Aurora on the topics of, among other things, the Aurora Police Department's policies and training regarding pat-down searches and protective sweeps of vehicles.

271.     Commander Lanigan is a 24-year veteran of the Aurora Police Department and has served in leadership positions across the Department, including as Commander for its Traffic Bureau.

272.     His testimony conclusively establishes that, despite being on notice of a widespread pattern and practice of unlawful searches and seizures of African Americans by its officers, the

City of Aurora has no policies, training, or supervisory review regarding pat-down searches and

protective sweeps of vehicles:

    a. He stated that, if an Aurora officer pulls over a driver, takes them out of the car, searches them, and writes them a ticket, there is no supervisory review of the officer's conduct during the stop;

    b. He stated that the Aurora Police Department trusts its police officers "to go out there and do the right thing every day";

    c. He stated that the Aurora Police Department has no supervisory procedure "to ensure officers comply with the legal standards to conduct a pat-down search";

    d. He stated that the Aurora Police Department does not impose "any requirements on its officers in terms of distinguishing between circumstances where a pat-down is appropriate versus not";

    e. He could not identify a standard that the Aurora Police Department teaches its officers "to distinguish between occasions where a pat-down would be appropriate versus not";

    f. He stated that the Aurora Police Department officers are not required to include details regarding pat-down searches, protective sweeps, or searches of vehicles during traffic stops in their incident reports;

    g. He could not identify a single Aurora Police Department policy regarding the legal standards for "officers removing drivers from vehicles, conducting pat-down searches, and conducting protective sweeps or vehicles";

    h. He could not identify a single Aurora Police Department training material that provides police officers the legal threshold for conducting a pat-down search; and

    i. He could not identify a single Aurora Police Department training material that sets forth what type of information may be sufficient or insufficient for officers to conduct a pat-down search.

    273. On February 10, 2020, Deputy Chief Harry Glidden testified as a 30(b)(6) witness

on behalf of the City of Aurora on the topics of, among other things, (i) all information regarding

the Internal Affairs investigations and disciplinary reviews of Officer McDermott's actions on

41

April 15, 2017 involving Mr. Penny and Ms. Brown, and (ii) the City of Aurora's policies and procedures used to supervise Officer McDermott during his tenure as an Aurora police officer.

274.    Deputy Chief Glidden is a 36-year veteran of the Aurora Police Department and has previously served as the Compliance ad Professional Standards Division Chief, the Internal Affairs Commander, and District 1 Patrol Commander, among other positions.

275.    Having reviewed the Internal Affairs investigation, the incident reports, and body camera footage, he stated that it is the Aurora Police Department's position that Officer McDermott's conduct during the April 15, 2017 incident with Mr. Penny and Ms. Brown was lawful, appropriate, and did not violate Department policy.

276.    He agreed that "[t]here's no mechanism that says an officer must articulate every time they do a pat-down [search], . . . whether they get them out of a car or not."

277.    He also stated that the Aurora Police Department does not have any system to review the number of people or proportion of people stopped by its officers to determine whether they are disproportionately stopping people of color and does not maintain demographic data on individuals subjected to pat-down searches by its police officers.

278.    The widespread pattern and practice of Aurora officers unlawfully stopping and searching African Americans as a result of their race and arrest record is a direct result of the City's failure to properly train and supervise its officers, despite being repeatedly put on notice through citizen complaints, lawsuits, and communications with the Aurora City Attorney's Office.

279.    The City of Aurora, these actions (and inaction) demonstrate that the City of Aurora has affirmatively trained and condoned the unconstitutional conduct described above, and has failed to adequately train supervise, and/or implement appropriate corrective procedures in a

deliberately indifferent manner, which has recklessly exposed a vulnerable population of people to unnecessary abuses.

280.    Indeed, these instances demonstrate that the City of Aurora has cultivated a culture where officers are trained and encouraged to perform unlawful searches and seizures of African Americans' bodies and vehicles based solely on their race and arrest record, and not on reasonable suspicion, probable cause, or any other lawful basis.

281.    The need for more or different training was so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the failure of City of Aurora policymakers to intervene demonstrates deliberate indifference.

282.    The action and inaction of the City of Aurora and its employees was a moving force behind the constitutional injuries suffered by Mr. Pittman and proximately caused or contributed to the injuries identified above, and if not stopped will likely lead to the constitutional violation of these and other persons in the future.

283.    As a direct and proximate result of the City of Aurora's indifferent employee training or supervision practices, Mr. Pittman was unlawfully detained and searched, without probable cause, reasonable suspicion, or any other legal basis in violation of the Fourth Amendment.

284.    As a direct and proximate result of City of Aurora's failure to train and supervise its officers to avoid searching and seizing African Americans based on their race and arrest record, Mr. Pittman suffered economic, emotional distress, humiliation, and dignitary injuries.

WHEREFORE, Plaintiff Teddy Pittman respectfully requests that this Court enter judgment in his favor and against Defendants and grant:

(A)     Appropriate relief at law and equity;

(B)     Declaratory relief that such conduct is unlawful;

(C)     Injunctive relief to prevent such misconduct from occurring again in the future;

(D)     Economic losses on all claims allowed by law;

(E)     Compensatory and consequential damages, including damages for emotional distress, humiliation, loss of enjoyment of lie, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

(F)     Punitive damages on all claims allowed by law and in an amount to be determined at trial;

(G)     Attorney's fees and the costs associated with this action, including expert witness fees, on all claims allowed by law;

(H)     Pre- and post-judgment interest at the highest lawful rate;

(I)     Any further relief that this Court deems just and proper; and any other relief as allowed by law.

**PLAINTIFF HEREBY DEMANDS A JURY TRIAL ON ALL ISSUES SO**

**TRIABLE**

Dated this 14th day of May, 2020.

s/ Kevin D. Homiak
Kevin D. Homiak, Esq.
HOMIAK LAW LLC
3900 E. Mexico Ave., Suite 820
Denver, Colorado 80210
Tel: (505) 385-2614
Email:  kevin@homiaklaw.com

*Attorney for Plaintiff Teddy Pittman*